

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-20-00069-CV

CSL S LONGVIEW, LLC D/B/A HAWKINS CREEK ASSISTED LIVING AND MEMORY
CARE COMMUNITY, Appellant

V.

PAUL WALLING AS NEXT FRIEND OF MARLYS WALLING, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 2020-299-A

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

## MEMORANDUM OPINION

In this healthcare liability case, CSL S Longview, LLC, d/b/a Hawkins Creek Assisted Living and Memory Care Community (Hawkins Creek) appeals the denial of its motion to dismiss the claims filed on behalf of Marlys Walling (Walling). On appeal, Hawkins Creek complains that the 188th Judicial District Court of Gregg County, Texas, erroneously denied its motion to dismiss Walling's claims for failing to file a sufficient expert's report required under the Texas Medical Liability Act (the Act). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. Because we find that the expert's report adequately addressed at least one pleaded theory of liability, and thereby satisfied the Act's requirements, we affirm the trial court's order.

## I.    Background

In February 2018, Walling, who was ninety-two years old and suffered from dementia because of Alzheimer's disease, was admitted to Hawkins Creek. Walling could feed herself and carry out other daily activities, and she could ambulate adequately with the aid of a walker. That said, because of her dementia, she would often forget to use her walker. Although she was a resident of Hawkins Creek for less than four months, Walling experienced several falls while trying to walk without her walker, some of which caused her to suffer injury. On or about May 9, 2018, Walling wandered into the room of another resident where she was hit, beat, and pushed by the other resident, causing Walling to fall and fracture her right hip. Walling was transported to Christus Good Shepherd Medical Center in Longview where she underwent surgery.

2

Walling filed a healthcare liability suit against Hawkins Creek for the injuries and damages she allegedly suffered while a resident at its facility. In compliance with the Act, Walling timely served Hawkins Creek with the expert report of Dr. Keith E. Miller.[1] After hearing Hawkins Creek's objections to the expert report and motion to dismiss Walling's claims,[2] the trial court denied the objections and motion to dismiss.

## II.  Standard of Review

We review a trial court's decision regarding the adequacy of an expert's report under the Act for abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877–78 (Tex. 2001). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). "A trial court does not abuse its discretion simply because it may decide a matter within its discretion differently than an appellate court." *Estate of Birdwell ex. rel. Birdwell v. Texarkana Mem'l Hosp., Inc.*, 122 S.W.3d 473, 477 (Tex. App.—Texarkana 2003, pet. denied) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985)). But an abuse of discretion will be found if the trial court fails to analyze or correctly apply the law. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). Our review is limited to the four corners of the report, but we read it along with the pleadings to determine whether it provides a basis for Walling's claims. *See Texarkana Nursing*

---

[1]Walling served Dr. Miller's initial expert report on May 2, 2020, and Dr. Miller's supplemental expert report on June 2, 2020, after Dr. Miller had reviewed more material. Since the supplemental expert report contains all of Dr. Miller's opinions and all the facts he relied on in rendering his opinions, the parties only cite the supplemental expert report, as will we.

[2]*See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b), (*l*).

3

*& Healthcare Ctr., LLC v. Lyle*, 388 S.W.3d 314, 318 (Tex. App.—Texarkana 2012, no pet.) (citing *Palacios*, 46 S.W.3d at 878).

### III. Applicable Law

A plaintiff who sues a defendant under the Act must serve on the defendant an expert report that meets the statutory requirements. "A valid expert report has three elements: it must fairly summarize the applicable standard of care; it must explain how a physician or health care provider failed to meet that standard; and it must establish the causal relationship between the failure and the harm alleged." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6)). An expert report that satisfies these requirements, even if only as to one pleaded liability theory, allows the claimant to proceed with his entire suit against the health care provider. *Id.* at 630, 632. A motion challenging the adequacy of an expert's report should be granted "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with" the statutory requirements. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*). "A 'good faith effort' is one that (1) provides information sufficient to inform the defendant of the specific conduct called into question and (2) enables the trial court to conclude the claims have merit." *Lyle*, 388 S.W.3d at 317 (citing *Wright*, 79 S.W.3d at 52). Conversely, "[a] report that merely states the expert's conclusions regarding the standard of care, breach, and causation is deficient." *Id.* (citing *Palacios*, 46 S.W.3d at 879).

4

## IV. Analysis

Hawkins Creek complains that Dr. Miller's report is deficient because (1) it does not make a good-faith effort to set forth any breach of any standard of care, and (2) it does not provide an adequate opinion on causation. Before addressing the merits of this complaint, we need to address a preliminary matter.

In its brief, Hawkins Creek maintains that the only relevant injury-producing event was the one occurring on May 29, 2018. Yet, in her original petition, Walling also recounts falls on March 18 and April 10, 2018, and states that she incurred an injury to her head in at least one of those falls. Walling also alleged that Hawkins Creek's negligence while Walling was under its care, from February 2018 through May 2018, rapidly accelerated the deterioration of her health and physical condition and led to physical and emotional trauma. Walling further alleged that Hawkins Creek failed to, among other things, ensure that Walling received the necessary supervision and monitoring to prevent falls and that it failed to provide, implement, and ensure that an adequate nursing care plan was followed by nursing personnel. She also pleaded for damages, including physical pain, suffering, and mental anguish in the past. Thus, although Walling's pleadings allege that Hawkins Creek's negligence caused the injuries she allegedly suffered on May 29, 2018, they also allege that Hawkins Creek was liable for any injuries that she suffered from other falls that occurred while under its care. So, in examining Dr. Miller's report, if we determine that it adequately addressed Hawkins Creek's liability for any of the injury-producing falls, we must affirm the trial court's ruling. *See Potts*, 392 S.W.3d at 630, 632.

5

## 1.	Dr. Miller's Report

In his report, Dr. Miller recited that Walling was ninety-two years old in 2018, that she suffered from dementia because of Alzheimer's disease, and that she could ambulate adequately with a walker.  But because of her dementia, Walling would forget to use her walker and needed to be reminded to not try to ambulate without it.  The report also noted that, while she was a resident of Hawkins Creek, Walling suffered injuries because of falls and that she fell many times.  As for those falls, the report states:

> On March 18, 2018, a Resident Service Note stated that Ms. Walling ". . . had another fall in the hallway."  It is not clear from the medical records when the fall previous to this had occurred.

> On April 10, 2018, Ms. Walling was heard screaming by the staff of Hawkins Creek Assisted Living Community.  She was found on the floor of the facility with an injury to her forehead.  An incident report stated that Ms. Walling had been trying to ambulate without her walker and as a result she fell to the floor.

> Despite this injury, there was no documentation in the medical records of any appropriate interventions implemented by the staff of this facility that would have prevented future falls.  There was no documentation in the medical records that Ms. Walling's physician or family were notified of this incident.  The only notation of any action taken by this facility was the brief statement "hospice notified[."]

> Only a week after her previous fall, Ms. Walling was heard screaming and found on the floor of this facility having fallen once again, on April 18, 2018.  A nursing summary noted that upon examining Ms. Walling for injuries, she was found to still ". . . have some facial bruising from a previous fall."

> Despite this injury, and having suffered at least two falls in only one week, there was no documentation in the medical records of any appropriate interventions implemented by the staff of this facility following this latter fall that would have prevented future falls.  There was no documentation in the medical records that Ms. Walling's physician or family were notified of this latter incident.

Ms. Walling's records in this healthcare facility documented frequent wandering without any specific interventions implemented which would have prevented this activity which was likely to result in injuries due to falls.

On May 22, 2018, a Resident Service Note stated that Ms. Walling had been ". . . up wandering throughout the night. On three different occasions . . . [."]

On May 23, 2018, another Resident Service Note stated that Ms. Walling ". . . would not stay in bed . . . she kept getting out of her bed . . . walking into living room area confused . . . [."]

On May 24, 2018, a final Resident Service Note stated that Ms. Walling ". . . kept getting out of bed . . . and walking into the living room area without her walker . . . [."]

. . . .

On or about May 29, 2018, when Ms. Walling was allowed to wander into the room of another resident, she was severely beaten by this resident and knocked to the floor. This attack, beating, and fall resulted in Ms. Walling suffering a hip fracture.

Among the standards of care applicable to caring for Walling, the report stated that Hawkins Creek and its staff were required to:

A.      Recognize and act on the fact that Ms. Marlys Walling was at higher risk for injuries due to falls, hip fractures, injuries due to failing to properly monitor, injuries due to failing to provide a safe environment, and related complications, by preparing and following a resident comprehensive assessment and an individual service plan based on an accurate assessment;

B.      Specifically implement an effective and accurate plan to prevent injuries due to falls, injuries due to failing to properly monitor, injuries due to failing to provide a safe environment, and related complications in Ms. Marlys Walling, by ensuring:

1.      That Ms. Walling was provided a safe environment in which to reside[] including protecting her from other residents of this facility;

7

> 2.    Ms. Walling was reminded to use her walker for
> ambulation at all times . . . .[3]

As for the breach of the standard of care, the report stated, among other things, that Hawkins Creek failed to prepare and follow a resident comprehensive assessment and an individual service plan based on an accurate assessment and that Hawkins Creek failed to ensure Walling was reminded to use her walker at all times. Dr. Miller explained:

> Both statutory regulations and the standard of care require a documented, individualized assessment of each resident soon after admission to an assisted living facility with updates over time or as the resident's condition changes. The purpose of such a medical record is to improve resident care by ensuring the staff has been thorough in its assessment, and it also helps to transmit vital information between healthcare providers and staff. Ms. Walling's advanced age, her medical history, and previous falls at this facility, all placed her at a very high risk for injuries as a result of future falls. These were all extremely important facts that should have been clearly listed in Ms. Walling's resident assessment which would have placed the staff of this facility on notice of Ms. Walling's risk for falling and would have caused a reasonable staff to provide proper interventions and care for this resident.

> Any competent and reasonable assisted living facility, practicing according to acceptable standards of care would have recognized and acted on the fact that Ms. Marlys Walling was at higher risk for injuries due to falls, hip fractures, and related complications, by preparing and following a resident comprehensive assessment and an individual service plan based on an accurate assessment. . . .

>     . . . .

> Hawkins Creek Assisted Living Community's own medical records indicated they were aware of Ms. Walling's risk for falls. Ms. Walling had suffered numerous previous falls while a resident in care of this facility, prior to her final fall on May 29, 2018. Despite having fallen multiple times and being

---

[3]Dr. Miller's report also sets forth two additional standards of care that he opines Hawkins Creek breached and concludes that such breach was the proximate cause of Walling's injuries. Because the report adequately addresses at least one theory of liability as to some of Walling's injuries through the two standards of care cited, we need not address the two additional standards set forth in the report.

aware that Ms. Walling was at high risk for future falls, Hawkins Creek Assisted Living Community failed to take appropriate precautions and interventions which would have prevented further falls and the injuries known to be associated with falls which include hip fractures.

Any competent and reasonable assisted living facility, practicing according to acceptable standards of care would have specifically implemented an effective and accurate plan to prevent injuries due to falls, a hip fracture, and related complications in Ms. Marlys Walling, by ensuring: (1) Ms. Walling was reminded to use her walker for ambulation at all times . . . .

The report also addressed whether the breach of these standards caused injury to Walling:

Had proper care as described in detail above, been given to Ms. Walling then more likely than not and to a reasonable degree of medical and nursing[] probability and certainty, Ms. Walling would not have suffered her injuries due to a fall, a hip fracture, and related complications, along with overall worsening of her condition, as well as unnecessary and preventable pain, suffering, mental anguish, and loss of dignity.

Dr. Miller also opined that Walling's injuries "could have, within a reasonable degree of medical and nursing[] probability and certainty, been prevented and/or detected/addressed earlier if these standards had been followed."

### 2. Dr. Miller's Report Adequately Sets Forth a Breach of the Standard of Care

Hawkins Creek first contends that Dr. Miller's report does not meet the statutory requirements for an expert report because the standards of care set forth in the report do not "inform the defendant of the specific conduct called into question" and do not "enable[] the trial court to conclude the claims have merit." *Lyle*, 388 S.W.3d at 317 (citing *Wright*, 79 S.W.3d at 52). It argues that the two standards of care set forth above are conclusory. We disagree.

The report sets forth that, because Walling had a higher risk for falls, Hawkins Creek was required to prepare and follow a comprehensive assessment and individual service plan.

9

Dr. Miller explained that the purpose of such an assessment and service plan was to alert the staff that Walling was at a high risk for falls so that proper interventions and care could be provided, specifically to ensure that Walling was reminded to use her walker for ambulation at all times. In several places, the report notes that there was no comprehensive service plan in the medical records. The report also notes that, even after Walling had fallen several times, at least one of which involved an injury to her forehead when she had not used her walker, the medical records were devoid of any reference to what interventions or measures would be taken to prevent future falls. Based on the lack of any documentation of any comprehensive assessment, individual service plan, or any indication that Hawkins Creek had taken any precautions or interventions to prevent future falls, Dr. Miller concludes that Hawkins Creek breached these standards of care.[4]

In support of its argument that the report's articulation of the standards of care was conclusory, Hawkins Creek points to *Lyle*, *Baylor All Saints Medical Center v. Martin*, and *Kingwood Pines Hospital, L.L.C. v. Gomez*. However, in *Lyle*, we found the report deficient when it simply stated that the standard of care "requires that the nursing facility provide a safe

---

[4]As to the breach of the second standard of care, Hawkins Creek argues that Dr. Miller impermissibly speculates that its staff failed to remind Walling to use her walker. In assessing the sufficiency of the report, a court may not draw inferences, but must look only to the information contained within the report. *Wright*, 79 S.W.3d at 52–53. However, experts, as opposed to courts, are not prohibited from making inferences based on medical history. *Clavijo v. Fomby*, No. 01-17-00120-CV, 2018 WL 2976116, at *10 (Tex. App.—Houston [1st Dist.] June 14, 2018, pet. denied) (mem. op.) (citing *Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 265 (Tex. App.—Fort Worth 2009, no pet.). For example, an expert may infer from the medical records' lack of documentation concerning any exploration, cleaning, or wound care procedures used that the wound was not appropriately explored and treated. *See Hood v. Kutcher*, No. 01-12-00363-CV, 2012 WL 4465357, at *4 (Tex. App.—Houston [1st Dist.] Sept. 27, 2012, no pet.) (mem. op.); *see also Quinones v. Pin*, 298 S.W.3d 806, 813 (Tex. App.—Dallas 2009, no pet.) (medical expert could rely on silence of medical records to support inferences). In his report, Dr. Miller infers from the absence of any documentation in the medical records that the staff failed to remind Walling to use her walker. Because we may only look to the information contained within the report, the accuracy of Dr. Miller's factual inferences is beyond our scope of review. *See Kutcher*, 2012 WL 4465357, at *4; *Quinones*, 298 S.W.3d at 813.

environment for its residents, insofar as it is possible," without stating any specific actions the facility was required to take in order to prevent the assault of its patient. *Lyle*, 388 S.W.3d at 318, 322. The court of appeals in *Martin* found the report conclusory when it simply opined

> (1) that Baylor [was] expected to adhere to 'specific standards of care'. . . , (2) that there must be policies in place to safeguard patients from assault, including employing "a sufficient number of security personal [sic] to insure that no unauthorized persons assault patients . . . ," and (3) that these standards must be adequately implemented.

*Baylor All Saints Med. Ctr. v. Martin*, 340 S.W.3d 529, 534 (Tex. App.—Fort Worth 2011, no pet.). In *Gomez*, the court of appeals found the report conclusory when it expressed the standard of care as the duty to provide a safe environment, to house safely, and to supervise closely, but gave no indication what specific conduct was required. *Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 748–49 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

Here, however, Dr. Miller's report goes further than simply opining that Hawkins Creek had a duty to take measures to prevent Walling from falling. The report expressed specific measures that Hawkins Creek was required to take in order to prevent her falls. Moreover, the report here is similar to the reports found sufficient in other cases involving falls at health care facilities.

> In *SSC Pleasanton Operating Co. LP v. Pennington*, the report opined that

> the "minimum standards of care" applicable to Pleasanton South included, "[t]raining and supervising its nursing personnel to ensure that they follow the nursing interventions for fall precautions in the nursing care plan and the recommendations of other disciplines," and "[t]raining and supervising its nursing personnel to ensure that they follow physician's orders regarding fall precautions."

11

*SSC Pleasanton Operating Co. LP v. Pennington*, No. 04-12-00551-CV, 2012 WL 6195576, at

*4 (Tex. App.—San Antonio Dec. 12, 2012, no pet.) (mem. op.).  The report went on to note that

Pennington's physician gave "instructions to the nursing staff to use and monitor a 'tab alarm'

and to ensure Mr. Pennington wore proper footwear to prevent falls."  *Id.*  The report also noted

that Pennington suffered four falls, that the medical records did not mention the nursing staff

responding to tab alarms, and that, in two of the falls, it was noted that Pennington was not

wearing socks.  On this evidence, the report concluded that Pleasanton South had breached the

standard of care:

> "[Pleasanton South] failed to adequately train and supervise its nursing personnel
> to prevent a fall from occurring as demonstrated by the fact that the nursing
> personnel failed to follow the care plan and the physician's orders which
> collectively required Mr. Pennington's tab alarm be in place and monitored and
> ensuring that Mr. Pennington was wearing proper footwear."

*Id.*  The court of appeals found the report's articulation of the standard of care and its breach

sufficient to satisfy the statutory requirements.  *Id.*

In *Peterson Regional Medical Center v. O'Connell*, the report stated that the standard of

care for a hospital that administered a fall-inducing medication to an elderly patient was to

provide additional monitoring by hospital staff to prevent falls.  *Peterson Reg'l Med. Ctr. v.

O'Connell*, 387 S.W.3d 889, 894 (Tex. App.—San Antonio 2012, pet. denied).  Because there

was no documentation of the need for additional monitoring and the patient was left alone after

administration of the medications, the report opined that there was a breach of the standard of

12

care.[5]  *Id.*   Because the report informed the defendant of the specific conduct called into question, the San Antonio Court of Appeals found that the report sufficiently stated the standard of care and its breach.  *Id.*

> In *Birdwell*, the expert's report addressed the standard of care and its breach simply as

> the Wadley Regional Medical Center's Practice Guideline:  Fall Precautions, and policy on use of restraints . . . clearly states the standard of care is:  "The patient will be provided an environment that is safe so that the patient is protected from injury during his/her hospital stay."  The use of restraints is clearly outlined in the details of the policy.  The patient's documented confusion, and inability to be taught, indicates a need for additional protection.  The failure to provide this protection for Mrs. Birdwell was clearly below the medical center's own standard of care.

*Birdwell*, 122 S.W.3d at 479.  We held that this sufficiently addressed the standard of care and its breach because "[t]he substance of [the] report gave fair notice to the hospital of (1) the standard of care, i.e., the standard of providing restraints to ensure an environment that is safe so that the patient is protected from injury; [and] (2) what the hospital did wrong, i.e., the failure to provide restraints."  *Id.* at 480.

Likewise, while it is arguable that Dr. Miller's report could have been more specific on the standards of care, we find that the report sufficiently set forth standards of care and the breach of the standards so that Hawkins Creek was adequately apprised of the conduct called into question.  Consequently, we find that the report satisfied the requirements that "it . . . . fairly summarize the applicable standard of care" and that "it . . . . explain how [Hawkins Creek] failed to meet that standard."  *Potts*, 392 S.W.3d at 630.

[5]A second report noted that there were no fall assessments or documentation that showed the care given to the patient after he fell.  Because nothing in the medical records documented his status and response to nursing care after a fall and no documentation showed that any interventions were taken to prevent additional falls, the report opined that a breach of the standard of care occurred.  *O'Connell*, 387 S.W.3d at 895.

### 3. Dr. Miller's Report Adequately Addresses Causation as to at Least One Theory of Liability

Hawkins Creek also contends that Dr. Miller's report merely makes conclusory statements regarding how the breach of the standards of care caused Walling's injuries and that it does not factually link his conclusions to the facts of the case. Hawkins Creek only addresses whether the report sufficiently links the breach of the standards of care to the injuries Walling suffered on May 28, 2019. Even so, as we have previously explained, Walling's pleadings do not limit her cause of action to the injuries and damages incurred on May 28. Rather, the cause of action also entails the injuries incurred from other injury-producing falls that occurred while Walling was under the care of Hawkins Creek. As a result, if the report provides a factual link between the breach of the standards of care and any of Walling's injury-producing falls, it will establish a causal relationship between the breach and the harm, and that will allow Walling to continue her suit. *See id.* at 630, 632.

Because "a plaintiff asserting a health care liability claim based on negligence, who cannot prove that her injury was proximately caused by the defendant's failure to meet applicable standards of care, does not have a meritorious claim," her expert "report must show that a qualified expert is of the opinion she can." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). "An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Id.* (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). This requires the expert report to "show[] how and why a breach of the standard of care caused injury" and to "make a good-faith effort to explain, factually, how proximate cause is going to be

14

proven." *Id.* Consequently, the report must show that the harm was foreseeable and that the negligent act or omission was a cause in fact of the harm—that the act or omission was "a substantial factor in bringing about the harm, and absent the act or omission . . . . the harm would not have occurred." *Id.* (quoting *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (per curiam)).

Considering the entire report, we cannot say that the trial court abused its discretion in finding that the report satisfied these requirements. In his report, Dr. Miller documented that Walling was a high risk for falling because of her advanced age and that, because of her dementia, she would forget to use her walker, which she needed to ambulate. The report also shows that the medical records lack documentation that Hawkins Creek prepared and followed a comprehensive assessment and service plan that would have put the staff on notice of her risk of falling and appropriate interventions. The report also documents that, by March 18, Hawkins Creek knew that Walling had fallen at the facility at least two times. It also documents that, after those falls, Hawkins Creek did not implement an effective plan to prevent future falls that included ensuring that Walling was reminded to use her walker for ambulation at all times. Also documented was Walling's April 10 fall that resulted from her not using her walker and in which Walling suffered an injury to her forehead. Dr. Miller opined that had Hawkins Creek given Walling proper care—prepared and followed a comprehensive assessment and service plan that would have put the staff on notice of her risk of falling and appropriate interventions and implemented an effective plan to prevent future falls that included ensuring that Walling was

15

reminded to use her walker for ambulation at all times—she would not have suffered her injuries due to her falls and her falls would have been prevented.

Thus, the report shows how and why Hawkins Creek's breach of these standards of care, at a minimum, caused the injuries Walling sustained on April 10. In doing so, the report showed both that Hawkins Creek knew or should have known of the harm that could have resulted from its failure to implement a plan to prevent falls, including ensuring that Walling was reminded to use her walker at all times, and that Hawkins Creek's failure to do so was a substantial factor in bringing about the injuries Walling suffered on April 10.

We, therefore, find that Dr. Miller's report fairly summarized the applicable standards of care, explained how Hawkins Creek failed to meet those standards, and established the causal relationship between Hawkins Creek's failure and the injuries Walling sustained on April 10. *See Potts*, 392 S.W.3d at 630. Since the report satisfied these requirements to at least one of Walling's theories of liability, we cannot say that the trial court abused its discretion in denying Hawkins Creek's motion to dismiss. As a result, we overrule Hawkins Creek's sole issue.

## V.     Conclusion

For the reasons stated, we affirm the trial court's order.


Scott E. Stevens
Justice

Date Submitted:     December 9, 2020
Date Decided:     January 12, 2021

16